03 Aventis v. Mylan 03 Aventis Pharma S.A. v. Mylan We're ready whenever you are. Thank you, Your Honor. May it please the Court? Your Honor, at minimum, this case should be remanded in light of aqua products for the Board to consider the patentability of the proposed amended claims under the proper burden of proof. We submit though, Your Honors, any further adjudication of those claims should not, should be done so not only under the proper burden but also under the proper claim construction and that is with the Preamble's limiting and I want to ask you about this Preamble. Do you, is it your position that the Preamble is just further defining the patient population or is it your position that the Preamble also describes the purpose for practicing the method? The purpose, Your Honor, under Janssen that when the Preamble sets forth the purpose of the method and the body of the claim directs that method to be directed to a patient in need it is a statement of intentional purpose for which the claim needs to be reported. But in Janssen at least and I think that the argument on the other side is that in Janssen, in need was the thought was that in need was helping to define the patient population which was described in the Preamble. Here we've got the Preamble, we have the in need of language and then we've got a separate description of the, a detailed description of the patient population. I disagree with the notion that the language in Janssen, that claim defined the patient population any further. The Preamble that claim is treating or preventing pernicious anemia. So it doesn't define patients with anemia. I think the suggestion from Milan was during prosecution history there was a Preamble directed to treating anemia in general and the examiner said that that is not commensurate with the scope of your unexpected results. So the claims were issued when that specific type of anemia was chosen but... I don't understand. I mean I, the reason before the district court you argued that all people, all humans are in need of preventing anemia and then this language was supposed to connect this particular anemia to the patient population you were treating. Right? That was Milan's argument that all patients are in need of increasing survival. That is not our position before or here. In fact that I mean, the idea that we're all in need of a method of increasing survival is true just by our mortality but just as in Janssen, we're all in need of a method of preventing anemia. We all need vitamin B12. Sometimes we get it through the food we eat but just because we don't... But I thought the limitation was for purposes of limiting that right? The limitation was construed to limit the population right? In Janssen? Yes. Not the population of patients that can receive the claim composition, the mixture of folic acid and vitamin B12. It defines patients who have anemia that are treated that way and also patients who are taking that vitamin combination for prevention of anemia. So what is the import of language in need of? In need of in Janssen imports this intentional purpose requirement. Which is? Why don't you explain it in English. So in Janssen, Rexall had a vitamin B12 and folic acid combination. And what the court held was for purpose of infringement, if that combination was taken by a patient without a recognized need of treating and preventing anemia, that is not direct infringement of that claim. So unless you have the patient in that case, here we're talking about the physician's intent. The patient in that taking folic acid and vitamin B12 with the claimed amounts for the purpose of treating or preventing anemia. I'm going back to Judge O'Malley's which I think she was getting there. I can get my brain around that. It seems somewhat different in this claim where it's not as in Janssen, a method of treating preventing a particular disease, but a method of increasing survival to a patient in need that of. In other words, someone who needs to increase their survival. Well, isn't that the entire world? Well, I think that's the point when we come to what is the after there's a decision on whether the preamble is limiting, there's the question of what is the construction of that preamble. I think just because of the fact that we're talking about increasing survival and we're humans, we think, well, this is yes, this is what we all need. Keep in mind, Your Honor, before the invention here, no one treated these particular patients with the intent of increasing their survival. That is the invention here. This is the first... Can I interrupt you for a minute? I mean, are you then through your argument, you're further defining the patient in need thereof with the where in limitation at the end of the claim? You've got a where in the patient has castration resistant or hormone refractory and metastatic prostate cancer. I mean, how does that play into this language with the patient in need thereof? Or does it not at all? It doesn't, Your Honor. That where in... It does not. So that defines the patient as having docetaxel resistant metastatic castration resistant prostate cancer. In need thereof is the antecedent basis for that is in the preamble, not in the where in. So what you're saying is that that patient population that you've defined before this point never would have gotten any treatment because there's no hope of cure. Is that right? Those patients got treatment, but they got treatment for palliative purposes. So just to keep them comfortable. To keep them comfortable. Yes. That's true for all medications. You're either taking a drug to increase your survival or make you feel better. So why does this drug, and this you know, this is just more of my understanding and background. Why does this drug do more than increase their comfort level? Well, the science behind that, I'm not sure anybody knows. But the issue here is, and what's borne out all over the prior art is you can give a drug to a patient with metastatic prostate cancer, and you can reduce their tumors. You can mean they're going to live any longer. Those are not surrogates for one another as both experts in this case agree. What's the difference here is now having now for the first time a method of treating these patients where you can actually prolong the life of those patients. Could I ask you on that when you're talking about increasing survival, how is that measured? Is it a couple days? I assume it has to be statistically relevant. Could you just speak to that for a minute? Yeah, well, it's measured in prolonging the life of the patient as to the standard of care for palliative purposes or no treatment at all. So the specific boundaries of when do you know whether you're actually prolonging the life of the patient, I'm not sure that is defined as a certain number of days or a certain number of months. We do have established circumstances from Mylan's expert. He says if I give a patient cabazitaxel, which is the drug that is the basis of the claims, if I give that drug to a patient for five cycles and they're still alive, I prolong their life because they would have been already dead. Now, do we know for sure, for certain, whether it was the drug that lived them long? No, but physicians can reasonably determine that because of that drug, that understanding the meaning of this preamble, it's telling us that this drug is being given for purposes of increasing survival. It's not as if it's only going to be infringed if somebody's life is actually increased. That's correct, Your Honor. It's the intent requirement, not that you have to have a specific finding that you actually have prolonged the life to determine whether you're practicing the claims or not. So a patient population, as defined in the wear-in clause, would not receive this drug if all the doctor was doing is trying to make them comfortable while they were dying, while they were in hospice, for instance. Before or after the results of the study? So we're talking, are there other purposes for administering this drug combination? Yes. To the same patient population? To the same patient population. You could conceivably give it... The slicing and dicing you're doing here is that it's the same patient population, it's the same drug, they're all in need of something, but you're saying the other claim dealt with palliative care, so we're claiming a new, not even use, it's the same use, a new result or something. Well, that's why I wanted to be careful with Judge O'Malley's question, whether we're talking beforehand or afterhand. Before the results of the Tropic Study Group, before this patent issued, no patient would have been treated with this drug. With the drug at all? With this drug at all. It wasn't as if it was treated, if the idea was we would use this for some other purpose, and now we're coming up with a new use. We have come up with data that supports its use at all. Beforehand, you didn't have sufficient data to conclude whether the benefits of the drug outweigh the risk of harm. But that's the issue of the three-drug regimen, right? That's a sort of different issue. I've been thinking about it differently. This is the issue with cabazitaxel itself. The actual taxing chemotherapy, which, as we all know, has great risks involved. In the first Phase I clinical studies, a patient died because of the drug. When you're giving chemotherapy to these patients, you're putting them at risk of serious harm or death. If you do not have sufficient clinical data from which to determine that the benefit you get from the drug outweighs that risk of harm, you don't give it to that patient. Can I just add, literally reading the in need of, it seems to me the board is right, that virtually all terminally ill patients defined in the claim need increased survival. The only thing that gets you maybe towards where you want to go is this intent requirement that's globbed on. Not the use of, but that they intended to use it for a particular purpose. Am I right? The claims were drafted with Janssen in mind with the specific idea that it would incorporate this specific intent element. That these claims are limited to situations where the physician administers the claim drug combinations with the specific intent to prolong the life of the patient. The word intent seems weird, meaning the purpose of practicing the method. Is that what you're talking about? The purpose, yes. The purpose for practicing the method. I guess what Judge Prost is getting at is once you have the drug, and once you know that this is the result that the drug is, why does having a purpose change the scope of the claim? Those cases, like the Montgomery case, the King Pharmaceutical case, the Bristol Myers-Squibb case, those are anticipation cases. Those are anticipation cases where you're talking about known methods, known processes. You have a method that's in the prior art that the public has the benefit of, and now you're claiming a result that is inherent to that method. Here, the method is not in the prior art. We are not in the world of anticipation. This is not a question of inherency, this is a question of obviousness. We have combinations of four different references to put together all of the limitations of these claims. It's not that this is claiming a new use of a known method. This is a new method. You're saying it's a new method, but the necessary piece of that is you're saying it's used the intent or the purpose, as Judge O'Malley said, is for increasing survival and not for palliative care. That was the proposed limitation, and in the motion to amend the patent owner expressly relied on that added limitation to distinguish the claims from the prior art. Since increasing survival in this context, we're not talking cure here. Increasing survival is managing to prolong life. Isn't there an overlap in a lot of circumstances in these cases between increasing survival and palliative care? There isn't with any of the prior art. There is no evidence of anything before the claimed method of use for these particular patients after they have failed docetaxel treatment that any of the known drug therapies or any of the therapies that have gone into phase three clinical studies prolong the life of the patient, any patient. These are statistical analyses. I think the question is different. She's saying, would it be that this drug, if administered, would not only extend life but also provide palliative care? It could. You could have those two purposes at the same time, but for both of those purposes, you need actual clinical data that supports that use. A physician does not administer a drug for a specific purpose without clinical data supporting that intent. The danger here with respect to this drug is you're saying that up to this point, no physician would have used this drug for purposes of just making someone comfortable because of all the risks that are involved. They would neither have done it for that purpose, nor would they have done it for the purpose of increasing survival. Yes, Your Honor. Thank you. This court should affirm the Board's decision on all three of the issues raised by Aventis in this appeal. Can I just go to what we were just talking about with your friend just to keep the chain of thought going? Why is it not the case that if indeed this language inserted in the claim limits it to the use for purposes of increasing survival, i.e. prolonging life, as opposed to palliative care, why isn't that an actual limitation? I mean, there hasn't been an obviousness determination or whatever, but why isn't that different than the other ordinary use, which was palliative care? That is different because in the Bristol Myers case, the BMS case was specifically on point here. There is no difference in the steps you perform as a result of having increased survival in the preamble or not as a limitation. There is no difference in how you practice the claimed method. Isn't there a difference in whether you would perform the steps at all? In fact, there's not. The suggestion that there would be no patient that would have been treated with this drug, cabazitaxel, without having the clinically significant data that showed an increase in survival is incorrect. In fact, there were three drugs that are all taxanes that are related. The oldest one, paclitaxel, is not actually approved to treat prostate cancer, but it's used to do so. It's used off-label. Similarly here, in this case, cabazitaxel was used. It was being used. It had been used in the Phase 1 clinical study. It had been used in the Phase 2 clinical study. But these are just clinical studies, right? I think what he said was that without having clinical studies it wouldn't have been provided to a patient. That's what I heard him to be saying. So I don't think he said something inconsistent with what you just said. Am I missing something? He was drawing a very fine line between, when are we talking about? In the doctor's mind, does the doctor yet have the clinical results? And he supposed on day minus 1, when the doctor doesn't have the clinical results, that the doctor cannot practice this method, because the doctor doesn't possess those results in his or her mind. On day plus 1, after the results, now suddenly something's changed. And that doctor's mind makes a difference. That cannot be the kind of limitation that this preamble language was meant to include in this claim. How do you distinguish Janssen? Is it that you don't see the treating or preventing anemia language is actually being interpreted to require that purpose? Exactly right. The anemia to be treated was a limitation of the claim. That's the holding of Janssen. That the specific type of anemia, which I won't try and pronounce, but the pernicious anemia had to be the point of treatment. And as Judge O'Malley suggested earlier, it's just where in the claim does the language appear? Here we have the docetaxel-resistant, metastatic castration resistant prostate cancer in the body of the claim. So this preamble language doesn't add anything. It doesn't add any to the claim. In BMS, I thought one of the major problems there was that they were proffering one construction for infringement and a different construction for claim construction. If this party wants to limit themselves so dramatically for purposes of infringement that says, you know, unless this is the purpose for which you're practicing the method, you can't be infringing, then doesn't the patentee have the right to limit their claim? They could have done so, but they didn't. The language that they chose, simply using the phrase increasing survival and then putting the thereof indeed thereof claim right after it as part of the body of the claim, really doesn't import the kind of limitation that my colleague on the other side is suggesting it does. They could have used words like clinically significant, statistically Tell me what you're doing to the claim. A method of increasing survival? Are you talking about putting that in the preamble language or in the claim? The amendment includes in the preamble a method of increasing survival. They could have added into that preamble language like clinically significant, statistically significant, some kind of language like that. And then that would have differentiated it for you. Absolutely. And the problem with that is that that cannot be a limitation because the statistically significant data come from a population study. And what we're talking about here in the claim is an individual patient. So we would run into all kinds of 112 problems if they tried to insert that into this language here. There would be an indefinite problem, there would be a written description problem, there would be an enablement problem. There might be a problem with written description or enablement from their use of the term survival and how that should be contemplated. But that's not the same as whether or not it's limiting. Right? It's a different inquiry. It can't be limiting because as both sides expert testified, when a doctor gives this drug to a patient, that doctor has no idea whether this patient is going to benefit in terms of overall survival. I'm sorry to interrupt you, but that's not the inquiry for determining whether a preamble breathes life and breath into a claim, right? Isn't that the proper inquiry that we're supposed to be looking at? Absolutely. The preamble here doesn't give life and breath to the claim as a whole. And the claim as a whole defines the patient population as metastatic castration resistant prostate cancer patients who have progressed during or after docetaxel. Those patients are by definition patients in need of increased survival. So there's nothing more that this additional language in the preamble adds by way of a limitation. But they're also in need of other things, right? I mean, increased survival would be great, but they're also in need of palliative care, right? Absolutely. Yes. These patients are suffering from terminal cancer. There has not been a cure found for this cancer. So these patients are inevitably going to continue to suffer with the disease and ultimately die from the disease or complication of that disease. What I understand your friend to be saying was that before this amendment, the suggestion was that anybody prescribing this was for the purpose of palliative care of a terminally ill patient. And that this is a different purpose. Increased prolonging life is a different purpose than existed previously. I don't think that's right. I think that the clinical studies... Is that right? That he's not arguing that or that it's factually incorrect? I think it's those who were conducting the Phase 1 study, for instance, had as one of the purposes of their study, this is the META reference, had as an explicit purpose of that study to seek preliminary indication of anti-cancer activity. They were doing the administration of cabazitaxel for the purpose of detecting anti-cancer activity. Right, so they wouldn't infringe. That equates to survival. The anti-cancer activity demonstrated... That equates to survival or it equates to a cure? Not a cure. Not a cure. That was to increase survival? The anti-cancer activity demonstrated in the Phase 1 trial plus in the Phase 2 trial, which was in the context of mesostatic breast cancer, also showed anti-cancer activity. And then this drug went into a phase 2. When you say anti-cancer activity, are you talking about reduced tumor growth, reduced tumor size? What are you talking about? In those studies, there was indication of both. There were lower levels of PSA. There were also reductions in tumor size. And I think your friend referenced those. And those are for purposes of increasing survival, not curing. Right. But now we get to the question of what would a person of skill in the art reasonably expect with a tax aim that is showing this type of anti-cancer activity? A person of reasonable... A person of skill in the art would have a reasonable expectation that you would, in fact, have increased survival as a result of the anti-cancer activity. So you're just arguing that even if it's limiting, it's still obvious? In the alternative. Absolutely. That would be something for remand. Do you agree with that? I don't. I think that there is substantial evidence here showing... We can't make that fact finding. If we think, just hypothetically, if we thought the preamble was limiting, we have to send it back to the patent office, don't we? Because we don't decide facts. I don't think so because the board, in its decision, explicitly said that on page 72 that to the extent the preamble may be considered limiting at all, it refers to a patient in need of increased survival. That's where it said they didn't prove that it was not obvious. So that's where the board put the burden on the wrong party. It also cites evidence of record showing that there was, in fact, anti-cancer activity. And the parentheticals that come right after that, you have the testimony of both sides' experts as well as the declaration. So we're talking about several different things. At a minimum, there's the argument that even if we accept everything you say, there's still a problem with burden shifting that doesn't comport with that law. So there's a question of whether or not, even accepting what you say, we would at least have to return it for the limited purpose of applying the correct burden. Then there's a step before that, which is that we would, and I think Judge Stoll was referring to that, that no, no, no, we're not going to determine this sort of based on the limited information the board gave us. And so that we would necessarily have to remand it, not only for the ACWA issue, but also for the obvious determination. I respectfully disagree with my colleague's suggestion that this absolutely has to be remanded in light of ACWA products. This case is uniquely positioned in that the final written decision came out about two weeks later. The court issued the ACWA products en banc decision. And the board, sous-spante, offered to the partner... Once a decision is issued, is there an obligation to seek reconsideration before you can appeal? There's no such obligation. So there's no, you're suggesting there's some sort of waiver thing that they didn't seek reconsideration. It's not waiver, but it is a factor. It's a factor, then when you take into consideration the fact that in the decision, the board, although it recited the pre-ACWA products standard, it in fact held Milan, the petitioner below, to that standard. But you're saying that they had an obligation to go back to the board under what they believed to be a wrong claim construction. So they would have gone back to the board to reconsider where they placed the burden, but they still would have been stuck with the same claim construction. So it would have been an exercise in futility in their mind. I understand that that's what was perhaps going through their mind with respect to the claim construction issue. But in fact when it comes to imposing the burden, what the board did below is it found that Milan, the petitioner here, had persuasively established the obviousness of what was interpreted to be the claim, the preamble without a limitation. Well why would the board have offered up for the parties to do additional briefing and to come forward if it didn't suspect that maybe there was a problem or some different analysis that would have applied if ACWA was at the time. The board was keenly aware of the pendency of the ACWA products case. In fact, on page 66 of the final written decision, they recite the burden being on patent owner and then include a citation to the in re ACWA products case and noting that the federal circuit had granted rehearing on bonk to address burdens of persuasion and production regarding motions to amend. So they were keenly aware even before they issued this final written decision that that was pending and that that was a potential issue. And I think that's probably why in the language... Except that they state right before that and right after that that the owner has the burden and he's not met his burden. Right, but when you look at what they did on page 74 and 75 of the decision, in page 75 for instance, the first full paragraph begins, petitioner persuasively establishes. That's Mylon bearing the burden and meeting that burden of establishing the obviousness of the claims here. So the claims really can be thought of in terms of having this treatment with cabazitaxel on the one hand and then also another new addition from the amendment having the pretreatment regimen. So there are those two parts, those two pieces. And the focus so far I think has been on the first part, on using cabazitaxel. That the board said on page 74 right in the middle of the page we reject the argument for the same reasons given in section 2B4 above. And 2B4 above of course dealt with the original claims which only had that cabazitaxel treatment portion. That burden was unmistakably on Mylon. In fact my colleague doesn't even suggest that they bore that burden. And that burden was met as recited in the final written decision before that. Thank you. Thank you very much. Just a few points your honors. On the last points on this issue of I guess the suggestion is that the difference in burden was harmless error. On the sections that Mr. Reed just pointed your honors to the first part  this petitioner persuasively establishes all they're saying all the board is saying is that the premedication was well known. That is not obvious. Just because the elements of the claim were well known does not establish that there was a specific motivation for a person of ordinary skill in the art to combine those elements with a reasonable expectation of success. That's just one point. The point on 74 where the board rejects the amended claims for the same reasons as section 2B4, that was under a limitation where the preambles were not limited. I do want to point out that in section 2.B.4 the board actually did find that the results of Tropic where the increasing survival were unexpected. On the issues of the idea that even under the different burden that there should be no remand. I think those points disagree with that. Going back to the preamble issue, my colleague mentioned that the BMS case was on all points here. I just want to reiterate a point that I made in my opening comments was that in BMS all of the actual steps in the claim were already in the prior art. Here that's not true. There is no dispute that there is no single reference setting forth all of the steps of the claim. This is not an anticipation case again like BMS was. This is an issue of obviousness. On the point about did the patent owner do enough to limit the claims, to seek this limitation, include this limitation and rely on that it's not just the language of the claim I want to remind you. They also expressly relied on that for distinguishing the invention from the prior art. This is effectively prosecution history at Staple. This is a clear and ambiguous disavowal as Judge O'Malley was alluding to this idea that here we have the patent owner specifically limiting the claims in a way adding limitations and we submit that the board has no discretion to ignore that clear reliance. Thank you. The case is submitted. That concludes our proceedings. All rise.